INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), and Its Affiliated Local 6000, Plaintiffs,

v.

Janine WINTERS, James Haveman, William S. Overton, Thomas D. Watkins, and Major General E. Gordon Stump, in their Official Capacities, Jointly and Severally, Defendants,

and

John F. Lopez, in his Official Capacity, Intervening Defendant.

No. 5:00–CV–21.

United States District Court, W.D. Michigan, Southern Division.

April 7, 2003.*

---

\* Editor's Note: Opinion republished to include additional material. Page 693, fourth full paragraph, through page 696, second full paragraph.

Daniel W. Sherrick, Legal Department, United Auto Workers International UAW Research Library, George B. Washington, Scheff & Washington, PC, Detroit, MI, for Plaintiffs.

Susan Przekop–Shaw, Denise Carole Barton, Mike Cox, Lansing, MI, for Defendants.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This case presents a constitutional challenge to random drug and alcohol testing requirements imposed on many State of Michigan employees by the Michigan Civil Service Commission pursuant to a collective bargaining agreement. Plaintiffs International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), and its affiliated Local 6000, hereinafter referred to collectively as "UAW," represent employees in the Department of Community Health, Department of Corrections, Department of Education, and Department of Military and Veterans Affairs, who are subject to these requirements. The first amended complaint contains four counts. By order dated March 30, 2001, the Court

dismissed counts II and III and part of count IV. The UAW has subsequently withdrawn the remainder of the count IV claim, which was dismissed on July 11, 2002. The claim asserted in count I is the only claim remaining for adjudication.

Proceeding under 42 U.S.C. § 1983, the UAW asserts that random suspicionless drug and alcohol testing of its represented employees infringes their Fourth Amendment protection against unreasonable searches. Named as defendants are Janine Winters, Director of the Office of the State Employer; James Haveman, Director of the Department of Community Health; William S. Overton, Director of the Department of Corrections; and Thomas D. Watkins, Superintendent of Public Instruction for the Department of Education. John F. Lopez, State Personnel Director, was granted leave to intervene as a defendant in this matter. The UAW seeks declaratory relief and injunctive relief prohibiting enforcement of the drug and alcohol testing requirements.

The parties have submitted the matter to the Court for judgment based on stipulated facts and briefs in lieu of trial. Having heard oral arguments of counsel and duly considered the matter, the Court concludes, for the reasons that follow, that the UAW's claim must be denied and that defendants are entitled to judgment in their favor as a matter of law.

## I

On May 20, 1999, the Civil Service Commission adopted the subject drug and alcohol testing program, essentially borrowing protocols and procedures issued by the United States Department of Health and Human Services and United States Department of Transportation. The testing program was incorporated into the 1999–2001 Collective Bargaining Agreement between the UAW and the State of Michigan. Article 52 of the Agreement identifies seven categories of "test-designated positions," which are subject to random selection basis drug and alcohol testing. The UAW represents 2,855 employees who occupy test-designated positions, all in the following four categories:

Category 2: A position in which the incumbent possesses law enforcement powers or is required or permitted to carry a firearm while on duty.

Category 3: A position in which the incumbent, on a regular basis, provides direct health care services to persons in the care or custody of the state or one of its political subdivisions.

Category 4: A position in which the incumbent has regular unsupervised access to and direct contact with prisoners, probationers, or parolees.

Category 5: A position in which the incumbent has unsupervised access to controlled substances.

Of the 2,855 UAW-represented employees in the test-designated positions, 2,287 are in the Department of Corrections, 560 are in the Department of Community Health, seven are in the Department of Military and Veterans Affairs, and one is in the Department of Education. Employees in these test-designated positions may be required, as a condition of continued employment, to submit to an unannounced, random, suspicionless urinalysis drug test or breathalyzer alcohol test. The urinalysis test tests for evidence of the use of marijuana, cocaine, opiates, amphetamine/methamphetamine and phencyclidine. Testing was commenced on March 1, 2000. Between March 1, 2000 and June 30, 2001, 507 UAW-represented employees were subject to random testing.

## II

 The UAW's Fourth Amendment claim is evaluated with reference to the Supreme Court's ruling in *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). In *Chandler*, the court recognized that drug testing of employees "intrudes upon expectations of privacy that society has long recognized as reasonable." *Id.* at 313, 117 S.Ct. 1295, quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Government ordered intrusions of this type are "searches" under the Fourth Amendment and must therefore be "reasonable" to pass constitutional muster. *Chandler*, 520 U.S. at 313, 117 S.Ct. 1295. Ordinarily, such searches must be based on individualized suspicion of wrongdoing to be reasonable. *Id.* However, particularized exceptions have been recognized based on "special needs, beyond the normal need of law enforcement." *Id.*, quoting *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402.

Although the case law speaks of a "closely guarded" class of suspicionless searches which must be justified by a "special need," recent decisions demonstrate that practically any proper governmental purpose other than law enforcement is sufficient to constitute a special need, triggering balancing between the governmental interests and the individual's privacy interests. *See Ferguson v. City of Charleston*, 532 U.S. 67, 81 n. 17, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). In *Marchwinski v. Howard*, 309 F.3d 330, 332–34 (6th Cir. 2002), the Sixth Circuit collected recent "special needs" rulings:

> The Supreme Court has ruled that government has a special need to conduct drug testing in several different circumstances where no particularized suspicion is present: testing of employees of the Customs Service who apply for positions directly involving interdiction of illegal drugs or positions requiring the agent to carry firearms, *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); testing of railroad employees involved in train accidents, *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); testing of student athletes in an effort to prevent the spread of drugs among the student population, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); and testing of students who participate in competitive extracurricular activities, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). This circuit has held that a school district has a special need to test applicants for all safety-sensitive positions in a school district, *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361 (6th Cir.1998); that a city has a special need to test its municipal bus drivers, *Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475 (6th Cir.1991); and that a city has a special need to test its firemen and policemen, *Penny v. Kennedy*, 915 F.2d 1065 (6th Cir.1990).

Defendants contend the drug and alcohol testing required under Article 52 of the Collective Bargaining Agreement is justified by such "special needs." Defendants argue that suspicionless random testing is authorized on a carefully tailored basis only for test-designated positions, the duties of which pose significant health and safety concerns.

 Yet, it is not for the Court to simply accept the State's invocation of a "special need." *Ferguson*, 532 U.S. at 81, 121 S.Ct. 1281. Rather, the Court must undertake a "close review" of the scheme at issue and "all available evidence," to

determine whether the proffered special need is "substantial—important enough to override the individual's acknowledged privacy interests." *Chandler*, 520 U.S. at 318, 117 S.Ct. 1295. The Court "must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at 314, 117 S.Ct. 1295. *See also, Knox County Education Ass'n v. Knox County Bd. of Education*, 158 F.3d 361, 373 (6th Cir.1998).

A survey of recent decisions illustrates this interest balancing process. In *Chandler*, the Supreme Court struck down a Georgia statute requiring candidates for designated state offices to certify that they had taken a urinalysis drug test within 30 days prior to qualifying for nomination or election and that the test result was negative. The court found that the state had failed to establish a special need to justify even this minimally intrusive search. In the absence of any evidence of a demonstrated problem of drug abuse among state office holders, the *Chandler* court concluded that the state's interest was primarily symbolic and therefore insufficient to outweigh individual privacy interests.

In *Ferguson*, too, the Supreme Court struck down a City of Charleston policy for lack of a showing of special need. The policy, allowing a hospital to subject pregnant patients' urine samples to drug testing without their knowledge and consent was deemed to serve primarily general law enforcement interests, even though the City asserted the beneficent purpose of protecting the health of both mother and child. That is, because of the dominance of the law enforcement purpose, the asserted public safety concern was deemed to be secondary or even insignificant.

The Supreme Court's most recent ruling in this area is *Board of Education of Independent Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 122 S.Ct.

2559, 153 L.Ed.2d 735 (2002). In *Earls,* the court upheld random urinalysis drug testing of all high school students who participated in competitive extracurricular activities. The students' privacy interests were deemed to be overridden by the school district's interests in deterring and preventing drug abuse.

In the Sixth Circuit, there have been two recent rulings of interest. First, in *Knox County,* the Sixth Circuit upheld random drug testing of all persons applying for "safety sensitive" positions in a school system, including teaching positions. As to the government's special need, the court held that "a local school district has a strong and abiding interest in requiring that teachers and other school officials be drug free so that they can satisfy their statutory obligation to ensure the safety and welfare of the children." 158 F.3d at 379.

Finally, in *Marchwinski,* a unanimous panel of the court vacated a preliminary injunction issued by the district court, restraining enforcement of a statute conditioning eligibility for Family Independence Program benefits on the applicant's submission to random substance abuse testing. Whereas the district court concluded that the state had not identified a sufficient special need, the Sixth Circuit disagreed, finding that "the evidence in the case at hand establishes that Michigan's special need does encompass public safety concerns, as well as other needs 'beyond the normal need for law enforcement.'" 309 F.3d at 335. Among the public safety concerns said to be sufficiently supported in the record were concerns that substance abuse by parents contributes substantially to child abuse and neglect, and that crime associated with illicit drug use and trafficking creates a public safety risk. *Id.* at 336. On January 21, 2003, however, the *Marchwinski* decision was vacated, as the

Sixth Circuit submitted the case for *en banc* review. *Marchwinski v. Howard,* 319 F.3d 258 (6th Cir.2003). The *en banc* ruling has not yet issued.

### III

Against this backdrop, the Court considers defendants' asserted special needs. Defendants contend the identification of test-designated positions was the result of a rigorous process designed to include only those positions that directly implicate public safety concerns. In adopting the random testing program embodied in Article 52, the Civil Service Commission followed the recommendation of the Employment Relations Board Impasse Panel. The Impasse Panel summarized the rationale for its recommendation as follows:

> The "test-designated" positions will be the only positions subject to *random* drug and alcohol testing. The Impasse Panel is persuaded that each of the categories of "test-designated" positions proposed by the OSE [Office of the State Employer] represents a legitimate and important concern for on-duty alcohol and drug abuse. Employees in "test-designated" positions who abuse alcohol and drugs represent a significantly greater threat to the health and safety of themselves and others than do employees in nontest-designated positions. Employees in "test-designated" positions may be required to react to unusual or dangerous circumstances. Also, the consequences of an error in judgment or performance arising out of drug or alcohol abuse are substantially greater for "test-designated" employees than for nontest-designated employees.
>
> On balance, the Impasse Panel finds that the governmental interest in the safety and security of employees, state institutions, and citizens outweighs the privacy concerns of the state employees in these "test-designated" positions. The Impasse Panel finds that alcohol

and illegal drug use by classified employees occupying "test-designated" positions can impair judgment and behavior so significantly that serious injury or death may result. In light of these risks, the Impasse Panel believes that the state is permitted to engage in suspicionless drug and alcohol testing without violating the constitutional rights of the employees.

Stip. Ex. 21, p. 11.

■ The largest group of employees subject to testing consists of 1,132 parole and probation officers and 25 field service assistants. They are subject to testing because they have law enforcement powers or use firearms and because they have regular access to parolees or probationers. The UAW concedes that the requisite special need is established with respect to those parole and probation officers who are actually authorized to carry a firearm. *See Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). As to the remainder of these positions, defendants rely heavily on the testimony of the former Director of the Department of Corrections, Kenneth McGinnis, before the Impasse Panel.

Director McGinnis testified that probation and parole officers spend a significant amount of time supervising clients away from the office and away from supervision by their superiors; that they have arrest powers and are charged with making safety and security decisions that demand alertness; that they are often required to take urinalysis drug test samples from their clients in the field, over 20 percent of whom have tested positive for unlawful drug use; and that the effectiveness of parole and probation officers would be compromised if they were under the influence of drugs or alcohol, jeopardizing public safety.

The second largest group of employees subject to testing consists of non-custodial employees in the Departments of Corrections and Community Health who work in the perimeter of a correctional facility, e.g., program coordinators, chaplains, counselors, therapists, teachers and dietician/nutritionists. Again relying on Director McGinnis' testimony, defendants contend that these employees have unsupervised access to and direct contact with prisoners, 80 percent of whom have a history of drug and alcohol abuse; that the introduction of alcohol and drugs into correctional facilities presents a severe threat to security within the facility and to the safety of correctional employees and prisoners; that employees have been involved in introducing drugs into the prisons; that employees who are involved in substance abuse may be vulnerable to influence by others who would bring drugs into the prisons; and that employees under the influence of drugs or alcohol suffer from impaired judgment, which could adversely impact security within the facility as well as the safety of other employees and prisoners.

Another group of test-designated positions consists of Department of Corrections and Department of Community Health employees who provide health care and psychological care to prisoners, e.g., nurses, occupational therapists, psychologists and social workers. These employees, the record shows, have both unsupervised contact with prisoners and access to medications, including controlled substances. Employees in this group, too, who are under the influence of drugs or alcohol while working or who are involved in substance abuse, defendants contend, may also suffer from impaired judgment, compromising facility security as well as the health and safety of other employees and prisoners.

Finally, a fourth group consists of Department of Community Health, Department of Education, and Department of Military and Veterans Affairs employees who provide health care and other services to residents at state hospitals for the mentally ill and developmentally disabled and to residents of veterans' homes, e.g., psychiatrists, psychologists, physicians, dentists, nurses, therapists and social workers. These employees have direct patient care responsibilities in state facilities and have access to medications, including controlled substances. Defendants contend these circumstances justify random testing because of (1) the risk of harm to vulnerable patients if a care-giving employee is under the influence; and (2) the risk that an employee involved in substance abuse might succumb to the temptation to take wrongful advantage of his or her access to controlled substances.

Defendants also contend their asserted special needs have nothing to do with law enforcement. The record demonstrates that drug and alcohol test results are kept confidential and are used exclusively for discipline in the workplace, as appropriate.

The UAW challenges the sufficiency of the asserted special needs primarily on the basis that they are hypothetical only. The UAW insists there is no demonstrated history of drug abuse among state employees in the test-designated positions. Absent such a showing, the UAW maintains, the exceptional circumstances necessary to avoid the Fourth Amendment's normal requirement of individualized suspicion are not established. *See Chandler*, 520 U.S. at 318–19, 117 S.Ct. 1295.

The Supreme Court recognized in *Chandler* that a demonstrated problem of drug abuse, although helpful to substantiate a special need, is not necessary in all cases. *Id.* at 319, 117 S.Ct. 1295. The court noted that in *Von Raab*, random drug

testing of Customs Service employees was sustained despite the absence of a documented drug abuse problem among Service employees. *Id.* at 320, 117 S.Ct. 1295. The Court went on to identify the following circumstances that nonetheless justified the *Von Raab* drug testing program: (1) that drug interdiction had become the agency's primary enforcement mission; (2) that employees subject to testing had access to vast sources of valuable contraband; (3) that Customs officers had been the targets of bribery by drug smugglers on numerous occasions and several had succumbed to the temptation; and (4) that it was not feasible to subject Customs officers to the kind of day-to-day scrutiny that is the norm in more traditional office environments. *Id.* at 321, 117 S.Ct. 1295.

In contrast, the *Chandler* court held the Georgia requirement that candidates for public office submit to a single pre-election urinalysis test on a date of their choosing was symbolic only. Because public safety was not genuinely implicated, the Fourth Amendment was held to preclude such suspicionless searches.

Here, it is clear that the State's justifications for random drug and alcohol testing are much more akin to those presented in *Van Raab* than *Chandler*. Although it cannot be said that all of the *Von Raab* justifying circumstances apply to any of the instant test-designated positions, some of them apply to each of the identified categories.

In *Earls,* moreover, the Supreme Court again recognized, in the public school context, that evidence of a particularized or pervasive drug problem is not essential. 122 S.Ct. at 2568. *See also, Knox County,* 158 F.3d at 374 ("[T]he existence of a pronounced drug problems is not a *sine qua non* for a constitutional suspicionless drug testing program."). The Court took notice that "drug abuse is one of the most serious problems confronting our society

today." *Id.,* quoting *Von Raab,* 489 U.S. at 674, 109 S.Ct. 1384. The *Earls* court observed that "it would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use." 122 S.Ct. at 2568. *See also, Knox County,* 158 F.3d at 379 ("We do not believe that the Board must wait passively for a disaster to occur before taking preemptive action to minimize the risks of such an occurrence."). Further, the public safety concerns implicated by the instant drug and alcohol testing programs are much stronger than both those presented and found wanting in *Chandler* and those presented and found sufficient in *Earls.*

The UAW protests, contending there is no empirical evidence to support the assumption that random testing is an effective deterrent of unlawful drug use or misuse of alcohol. The efficacy of the challenged drug testing program is a factor to be considered in evaluating the sufficiency of the asserted special needs. *See Earls,* 122 S.Ct. at 2567. In *Earls,* the court summarily concluded that testing students who participated in extracurricular activities was a reasonably effective means of addressing the school district's legitimate safety concerns in preventing, deterring and detecting drug use. *Id.* at 2569.

This general conclusion is supported, moreover, in the present record by the testimony of Director McGinnis, who observed that drug testing of the inmate population since the 1980's has been followed by "a pretty significant drop in the number of positives." Stip. Ex. 9, p. 59. Also supporting the conclusion that random drug testing is an effective deterrent is the report of Donald Ian Macdonald, M.D., former Director of the White House

Drug Abuse Policy Office under President Ronald W. Reagan. Dr. Macdonald evaluated the Michigan testing program in light of the UAW's challenge and issued an 18–page report on March 18, 2002. He examined the "Quest Index," reflecting workplace drug testing positive rates, from 1987 to 2001, and interpreted the 74 percent decline in positive rates as "a definite sign that the program is working." Macdonald Report, pp. 4–5. Dr. Macdonald further observed:

> Michigan has adopted the federal rules and followed its recommendations for pre-employment testing, random unannounced testing, probable cause testing, post accident testing, and return-to-work testing. All of these make sense.
>
> . . . . .
>
> Random unannounced testing, could potentially be the most useful. The knowledge of the possibility that unannounced testing may occur at any time can be a strong deterrent to drug use. If performed often enough random tests should act as a strong incentive to avoid drug use for the worker who wants his job and knows that a failed test will have negative consequences.

*Id.* at p. 6.

The Court is thus satisfied that the efficacy of the challenged drug and alcohol testing program has been adequately established. The Court is also satisfied that defendants have asserted sufficient "special needs," based on substantial, and not merely hypothetical, public safety concerns, to facially justify the random testing of employees in the test-designated positions.

### IV

Defendants having thus met the requisite "special need" threshold, it remains to be determined whether the State's interests outweigh individual employees' reasonable expectations of privacy. Defendants maintain they have endeavored to respect employees' privacy rights as much as possible by limiting test-designated positions to safety sensitive positions. Moreover, because of the safety and health concerns implicated, employees in test-designated positions are said to work in heavily regulated fields of employment, in which they necessarily have diminished expectations of privacy.

In *Skinner*, railroad employees were deemed to have diminished expectations of privacy because they participate in an industry pervasively regulated to ensure safety. 489 U.S. at 627, 109 S.Ct. 1402. In *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), student-athletes were deemed to be analogous to employees in a closely regulated industry, who "have reason to expect intrusions upon normal rights and privileges, including privacy." *See also, Earls*, 122 S.Ct. at 2566 (applying the same reasoning to students who participate in extracurricular activities). In *Knox County*, the Sixth Circuit held that public school teachers participate in a heavily regulated industry and therefore have diminished expectations of privacy. 158 F.3d at 383–84.

In comparison with the above examples, it can hardly be denied that employees in the test-designated positions clearly participate in heavily regulated industries. Department of Corrections employees charged with supervision of felony offenders, parolees and probationers, certainly participate in a heavily regulated field. Similarly, healthcare and other professional providers of services to prisoners, patients and other residents of state facilities are also subject to comprehensive regulations. Indeed, the UAW does not seriously contest the proposition that employees in test-designated positions have diminished expectations of privacy. The UAW

maintains, however, that such employees are still protected by the Fourth Amendment. The UAW cites authorities from three federal circuits holding that even persons as highly regulated as prison employees cannot be subject to strip searches without reasonable suspicion.

This argument calls into question the character of the required intrusion upon privacy rights. The degree of intrusion caused by collecting a urine sample "depends upon the manner in which production of the urine sample is monitored." *Earls,* 122 S.Ct. at 2566, quoting *Vernonia,* 515 U.S. at 658, 115 S.Ct. 2386. Defendants contend their testing program is designed to be minimally intrusive. They point out that the procedure for collecting a urine specimen from an employee requires that individual privacy be preserved unless there are grounds to suspect tampering:

> While the specimen collector may be outside the bathroom or restroom in the near proximity, the employee closes (and locks, if he/she chooses) the door and has full privacy while urinating.... The employee is afforded as much privacy as he/she would ordinarily have when using a restroom/bathroom at the workplace, a restaurant, or other public environment.

Report of Donna R. Smith, Ph.D., July 8, 2002, p. 1. This procedure is even less intrusive than the "indirect monitoring" (requiring monitor to wait outside closed restroom stall) sustained in *Earls* as a "negligible intrusion." *See also, Vernonia,* 515 U.S. at 658, 115 S.Ct. 2386 (holding the intrusion "negligible" even though male students were required to produce samples at a urinal along a wall while observed

from behind). The instrusiveness of this procedure, marked by careful respect for employee privacy, does not even approach, of course, that of a strip search, and is properly characterized as negligible.[1]

Further, defendants insist that every effort is made to protect the confidentiality of test results. Information is not released to any law enforcement agency. In fact, unless the employee consents in writing, test results are not disclosed to anyone other than the employee, the Medical Review Officer ("MRO") and the employer. The MRO is a physician with specialized knowledge of substance abuse disorders and drug testing procedures. The MRO reviews and interprets test results and confidentially discusses any possible medical explanation for a positive result with the employee before reporting the results to the employer. Positive results may lead to the imposition of discipline, but any adverse action is subject to the grievance and arbitration processes provided in the Collective Bargaining Agreement. All of these circumstances militate in favor of upholding the testing as being minimally intrusive. *See Earls,* 122 S.Ct. at 2566–67.[2]

To be sure, employees in test-designated positions retain their Fourth Amendment rights. Yet, considering the minimally intrusive nature of the drug and alcohol testing required under Article 52, the Court is convinced that employees' ordinary right to freedom from suspicionless testing is outweighed by the State's substantial public safety concerns.

---

1. That the instant drug testing program results only in minimal intrusion is underscored by the UAW's concession that, because only 15 percent of the affected workforce is tested each year, an individual employee can be expected to be tested only once every seven years on average.

2. Although the parties have not drawn a distinction between drug testing and alcohol testing in this regard, it is clear that a breathalyzer test is even less intrusive than urinalysis testing.

## V

The Court has thus duly considered the competing interests implicated by the State's random drug and alcohol testing program and by the UAW's Fourth Amendment challenge to it. Under the still developing governing body of law it is clear that the program embodied in Article 52 of the Collective Bargaining Agreement is supported by sufficient "special needs," that is, legitimate governmental purposes other than law enforcement. Further, the State's public safety concerns are sufficiently substantial to outweigh the relatively minor intrusion upon privacy rights caused by the subject suspicionless testing of designated employees. Accordingly, the Court concludes the challenged program is not unconstitutional. Plaintiffs' claim under 42 U.S.C. § 1983 for declaratory and injunctive relief must therefore be denied and judgment must be awarded in favor of defendants. The Court's judgment to this effect is set forth in a separate document.

## AMENDED JUDGMENT ORDER [1]

Plaintiffs International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) and its affiliated Local 6000, hereinafter referred to collectively as "UAW," in the lone remaining count of their first amended complaint, count I, having under 42 U.S.C. § 1983, challenged the constitutionality of random drug and alcohol testing imposed by defendant state officials upon many UAW-represented employees, who are classified state employees in the Department of Corrections, Department of Community Health, Department of Military and Veteran Affairs, and Department of Education; and

The UAW contending that the testing is violative of the Fourth Amendment protection against unreasonable searches and having sought declaratory and injunctive relief; and

The parties having submitted the matter to the Court on stipulated facts and briefs in lieu of trial, and the Court having heard oral arguments on the matter on October 28, 2002, and having taken the matter under advisement; and

The Court having carefully considered the claim under controlling Supreme Court and Sixth Circuit authorities, and having undertaken a context-specific examination of the competing private and public interests advanced by the parties; and

The Court finding that the challenged state drug and alcohol testing program is justified by sufficiently substantial "special needs" and holding that the subject random drug and alcohol testing is not violative of the Fourth Amendment;

Now therefore, and for the reasons more fully set forth in the Court's accompanying written opinion;

**IT IS HEREBY ORDERED** that the UAW's claim for declaratory and injunctive relief is **DENIED, and JUDGMENT** is hereby **AWARDED** to defendants.

---

1. The original judgment order issued on March 31, 2003. This amended judgment order effects only technical corrections, amending the caption so as to delete defendant Douglas Howard, and deleting reference to the Family Independence Agency, in conformity with the stipulated order dated July 11, 2002 (docket # 47).